**DAN RIVER, INC., Appellant,**

v.

**UNITEX LIMITED; Mannip Limited; Cheng Fur She; Cheng Lee Kit-Yiu; Philip Y. S. Cheng; Lee Chen Che; Liu Han Tang; Yang Yuan Loong; Dora Yang; The "Roe" Bank of Hong Kong; The "Doe" Finance Company of Hong Kong; "XYZ" Company, Appellees.**

No. 79–1267.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1980.

Decided May 29, 1980.

As Modified Aug. 11 and 18, 1980.

---

Max Gitter, New York City (Arthur L. Liman, Jack Hassid, Colleen McMahon, Andrew J. Peck, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Lewis T. Booker, Gregory N. Stillman, Hunton & Williams, Richmond, Va., on brief), for appellant.

Michael W. Schwartz, New York City, Baldwin B. Tuttle, Kutak, Rock & Huie, Washington, D.C., Edmund H. Kerr, New York City, Bernard E. Goodman, Vienna, Va., Philip B. Morris, Richmond, Va., Paul Vizcarrondo, New York City, Stephen R. Larson, Michael W. Smith, Richmond, Va. (Wachtell, Lipton, Rosen & Katz, New York City, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., Kutak, Rock & Huie, Denver, Colo., Wickwire, Peterson & Gavin, Los Angeles, Cal., Cleary, Gottlieb, Steen & Hamilton, New York City, on brief), for appellees.

Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and SPROUSE, Circuit Judge.

DONALD RUSSELL, Circuit Judge.

This is an action by the plaintiff Dan River for injunctive relief under the Williams Act[1] against the defendants, Unitex Limited, a Hong Kong corporation, its subsidiary Mannip Limited, a British Virgin Islands corporation, Unitex's controlling directors and stockholders, and two Hong Kong banks. The district court at first granted the plaintiff a temporary restrain-

1. 15 U.S.C. §§ 78m(d)–78m(e).

ing order pending further clarification of the defendants' 13D Schedule as required under the Williams Act, but, after the defendants amended their earlier filing, it dismissed the action on jurisdictional grounds. The plaintiff has appealed. We reverse.

## I.

The plaintiff is a large textile manufacturing corporation chartered under the laws of Virginia with its headquarters in Danville, Virginia. Its capital stock at times appropriate to this action consisted of 5,595,035 shares of common stock. The defendant Unitex Limited is a corporation engaged in the manufacture in Hong Kong of textiles which it offers for sale in Europe and the United States. The individual defendants, all residents of Hong Kong, own over two-thirds of the capital stock of Unitex and are its controlling directors.

Sometime in the fall of 1978, Unitex, on the recommendation of its retained investment advisor, Lazard Freres & Company, an internationally known investment firm, determined to acquire a substantial equity position in Dan River stock. In order to finance such purchases, it began negotiations with the executive director of the defendant Wardley Limited, a Hong Kong financial institution, for a loan to finance its purchases of Dan River stock. Wardley expressed a willingness to consider such financing, "provided that Wardley's could be assured of the fundamental *financial soundness of Unitex's plan*." (Italics added) Apparently, Wardley received sufficient assurances of "the fundamental financial soundness of Unitex's plan" for acquiring an equity interest in Dan River, for Wardley advanced Unitex initially what is described as bridge financing in the amount of $2,700,000 for the purpose of initiating the purchase of Dan River stock.

By December 1, 1978 Unitex, or individuals affiliated with it in its plan *for* acquiring a substantial equity position in Dan River stock, had accumulated at least 62,700 Dan River shares. Of these, 47,800 shares

were purchased by two of the individual defendants, or members of their immediate families. Between December 1 and December 12, Unitex itself acquired 216,900 shares of Dan River stock by purchases made on the New York Stock Exchange. If these purchases were combined with the earlier purchases, the plaintiff contends, though the defendants deny, that Unitex or persons within its controlling group would have owned 279,600 Dan River shares or just over 5 percent of Dan River's outstanding stock. Under the provisions of § 13(d) of the Williams Act, any person, upon acquiring more than 5 percent of the stock of any corporation, is required to file with the Securities and Exchange Commission within ten days after acquiring such stock ownership, and to mail to the target corporation, a Schedule 13D disclosing (a) the identities and background of the purchasers, (b) their purposes in acquiring the stock, (c) the sources of their financing, (d) the extent of their acquisitions, (e) any arrangement or contracts with other persons concerning the stock and (f) any other material information. This statute was supplemented by more specific regulations issued by the Securities and Exchange Commission. 17 C.F.R. § 240.13d–1, *et seq.* (1978). The parties, however, did not file the required 13D Schedule and, on December 14, the individual defendants sold 47,800 shares in block trades on the Stock Exchange. Of these, forty thousand appear to have been sold back to Unitex but 7,800 shares were disposed of to another party. It is the plaintiff's contention that these sales were made for the purpose of avoiding any possible obligation to file a 13D Schedule. The defendants, however, deny the necessity to sell such stock in order to avoid any obligation to file a 13D Schedule and assert that these sales were made because the purchase by the individuals, made allegedly without the knowledge of Lazard, violated a Lazard policy that "whenever it is advising a client (here, Unitex) with respect to a program of stock purchases, its client must see to it that no purchases of the stock in question are

made by related firms or individuals at the same time."[2]

Whatever the purpose of the sale of 47,800 shares previously purchased, Unitex discontinued after December 14 any further purchases of Dan River stock until (1) it had established a corporate subsidiary, the defendant Mannip Limited, in the British Virgin Islands, whose sole purpose was to acquire all future purchases of Dan River stock on Unitex's behalf and to hold all Dan River stock then owned or later acquired on behalf of Unitex, and (2) until it had completed its final financing arrangements with Wardley and its associated bank, the defendant Chartered Bank. Sometime in January, 1979, it, however, had completed both the incorporation of Mannip Limited and finalized its financing arrangements with Wardley and the Chartered Bank.

Under its agreement with the two financial institutions, Unitex was granted a line of credit in the amount of $13,300,000 in order to purchase Dan River stock. However, under the loan agreement, the price at which Unitex purchased stock required approval of the banks. To secure this loan, Unitex pledged its interests in Mannip (that is, it pledged all the Dan River stock acquired by it) and the worth of Unitex itself. In addition, four Unitex directors personally agreed to advance approximately $1,000,000 against the loan and to guarantee individually the remainder of the loan should Unitex default.

On January 29, 1979, Unitex resumed purchasing Dan River stock, quickly acquiring sufficient shares to bring Unitex within the filing requirements of § 13(d). At this point it transferred all its Dan River stock to its nominee, the corporate subsidiary Mannip, and all future purchases were made in Mannip's name but with funds advanced by Unitex. Because its holdings had by the end of January gone over the 5% level, thereby triggering the requirement of a § 13(d) filing, a 13D Schedule was filed with the Securities and Exchange Commission by Mannip on February 9, 1979, and mailed to Dan River on the same date.

This 13D Schedule, as filed *only* by Mannip, fixed Mannip's ownership of Dan River stock at that time as 333,700 shares, described the relationship between Unitex and Mannip, and included some information about Unitex's directors and their transactions in Dan River stock. It stated the purpose of the Dan River stock purchases as follows:

> "While Mannip is not solely a passive investor in the Company, neither Mannip nor Unitex has any present intention to seek control of the Company or to propose a merger or similar transaction with the Company. Mannip may seek to acquire a significant equity interest in the Company with a view toward establishing a long term relationship with the Company. Mannip is continuing to purchase Shares in open market transactions, and, depending on market and other conditions, Mannip may continue in the future to purchase Shares from time to time in open market or private transactions."

Dan River filed on February 22 its action against the defendants alleging various omissions and misleading statements in Mannip's filing and improper failure by other defendants either to join in Mannip's filing or to make their own filing. It sought declaratory, injunctive, and other equitable relief. In connection with the commencement of its action, Dan River also moved for a preliminary injunction and applied for a temporary restraining order pending the hearing on the motion for an injunction. After a hearing on the application for a temporary restraining order held on February 23, 1979, the district court ruled that "plaintiff's right to [additional] disclosure [was] clear" and restrained the defendants from making any additional purchases of stock until they had filed "an amended or new Schedule 13D which makes the appropriate disclosures." The district court proceeded to specify the additional

---

**2.** Lazard justified this policy as a "matter both of good financial practice and of practical prudence (*e. g.,* to avoid) to the extent possible, involvement in just the kind of litigation which has eventuated here."

material to be included in the "amended new Schedule 13D":

"a. The identities and backgrounds of PAS, Ltd. and CMS, Ltd.;

"b. The extent of the non-passive position and objectives that defendants propose to be able to effect from their holdings of plaintiff's stock;

"c. The entities which defendants propose for the establishment of long-term relationships with plaintiff;

"d. The identities of the foreign lending institutions and the agent referred to in the exhibits annexed to defendant Mannip Ltd.'s Schedule 13D filed on February 9, 1979;

"e. Whether the individual defendants have arranged for financing for the acquisition of plaintiff's shares and, if so, the sources of the funds; and

"f. The background information required by Section 13(d) of the Williams Act for each of the individual defendants;"

The district court also set a hearing on the motion for a preliminary injunction and directed the parties to engage in discovery on an expedited basis prior to that hearing.

Mannip and Unitex filed a new Schedule 13D on March 1, 1979. This new filing supplied a number of the omissions noted by the court at the earlier hearing on the application for a preliminary restraining order and added a new statement of the purpose of the stock accumulations. This new statement of purpose was:

"The purpose of Mannip's purchasing Shares is to acquire an equity investment in the Company. The Filing persons intend continuously to evaluate Mannip's position in the Company and the Company's business and industry. The Filing Persons presently intend for Mannip to make additional purchases of Shares in open-market or private transactions, the extent of which will depend upon such evaluation and upon prevailing market and other conditions. Neither Mannip nor Unitex presently intends to seek to acquire control of the Company, to seek representation on the Company's Board of Directors, to seek joint ventures on other business relationships with the Company or to propose a merger or similar transaction with the Company. In addition, depending upon the results of such evaluation and upon prevailing market and other conditions, Mannip may dispose of all or a portion of its Shares.

Since the Filing Persons could determine to seek to acquire control of the Company, seek representation on the Company's Board of Directors, seek joint ventures or other business relationships with the Company or propose a merger or similar transaction with the Company, Mannip should not be considered solely as a passive investor. However, it should not be assumed that a plan will in fact be formulated to do any of the foregoing.

Except as set forth above, there are no present plans or proposals which relate to or would result in a merger, reorganization or liquidation involving the Company, the sale or transfer of a material amount of the Company's assets, any change in the Company's Board of Directors or management or any other material change in the Company's business or corporate structure."

With the filing of this new or amended Schedule 13D, the defendants moved to dismiss the complaint for lack of subject-matter jurisdiction. They predicated such motion on the claim that they had fully complied with the earlier order of the district court and had met the requirements of § 13(d), thereby rendering plaintiff's action moot.

The next day after the defendants made their filing the plaintiff amended its complaint, charging omissions, inconsistencies, and contradictions in the amended 13D Schedule. It particularly found the purpose clause flawed in these respects:

"a) On information and belief, defendants fail to disclose that they are buying Dan River stock as alter egos for Textile Alliance Limited ("TAL"), a major Hong Kong textile enterprise founded and operated by defendants Lee and Yang, two of the Controlling Directors of Unitex.

On information and belief, defendants fail to disclose that one of defendants' and TAL's purposes in sponsoring defendants' acquisition of Dan River is to seek a position of sufficient control or influence in Dan River to enable TAL or defendants to obtain on unduly favorable terms textiles made by Dan River that are in short supply in the world market, thereby misappropriating a valuable commercial asset of Dan River and its stockholders.

"b) The statements in Item 4 of Amendment No. 2 contradict statements made in Item 4 of Mannip's Schedule 13(D) filed February 9, 1979 even though defendants state in the Amendment that the original Schedule 13(D) fully and adequately disclosed defendants' true purposes.

"c) Item 4 fails to disclose fully the 'non-passive' role defendants intend to play in Dan River, or to identify the 'long-term relationship' that defendants may seek to establish with Dan River although this Court has specifically instructed defendants to make such disclosures.

"d) Amendment No. 2 fails to disclose the purposes for which the Controlling Directors are involved in this transaction."

The plaintiff then moved to continue the restraining order the district court had earlier granted. The district court, however, refused the motion and vacated the restraining order previously allowed. It also reversed its earlier provision for discovery. Sometime later, it heard the motion for a preliminary injunction. At the hearing both parties submitted various affidavits. At the conclusion of the hearing, spread over a period of several days, the district court denied the motion and granted the motion to dismiss the action on jurisdictional grounds.

## II.

In dismissing the action, the district court declared that § 13(d) of the Williams Act "was intended [simply as a disclosure act] . . . for the benefit of investors and not management" and was not to be used "as a tool for management to preserve their offices." It added that "management [had] no rights under the Williams Act," only a role to act as "the conduit by which the disclosed information [was to be] transmitted to the [stockholders]." It seemed to assume, though it did not say so explicitly, that, in discharging its role of a "conduit," the target corporation may require the defendant in an equitable action to file a Schedule 13D which would *facially* meet the requirements of the statute but that, when that had been done, the target corporation —and, for that matter, the district court itself—has no right to question the accuracy, truthfulness, or completeness of such Schedule or to complain that in any material instance the Schedule was "false or misleading," but that such right was exclusively the right of a stockholder to be exercised in an action for damages.[3] It had earlier, in dissolving the restraining order previously granted by it, stated that, while a "question of the truth or falsity of the 13D" was "grave," the court could not "entertain a notion [sic] at this time that [any material statement in the 13D Schedule [was] false." It appeared from this statement to hold that, in a 13(d) action by a target corporation, the district court was to accept as "true" the statements by the purchasers since they were "under oath"[4] and that, even if there were reasonable inferences in the record "casting doubt upon the veracity of the affiant" who swore to the Schedule 13D, the falsity or incompleteness or misleading character of the Schedule was not

---

**3.** It is of interest that the district court stated in its oral order of dismissal that it had inquired during argument of defendants' counsel what jurisdiction the court might have in this case if the 13D Schedule were "false and misleading" in some substantial respect but that counsel "didn't want to answer that question and didn't answer it."

**4.** The language of the district court was:

"I know that there has been a 13D filed which on its face complies with the law and it's under oath, therefore, I expect it's true."

cognizable in an equitable action by the target corporation so long as the Schedule facially met the requirements of the statute.

## III.

■ The threshold question raised by the defendants addresses the standing of the plaintiff to maintain this action. The district court found, and the defendants press the point on this appeal, that section 13(d) was enacted for the sole benefit of stockholders and not to provide "armament" to management in resisting takeovers or accumulations of the stock of corporations. Since the plaintiff corporation is not thus "within" the particular class intended to be protected by the statute, "it has no standing to maintain an action" under the statute. For this proposition, the defendants rely, as did the district court, on *Rondeau v. Mosinee Paper Corp.*, (1975) 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12, and *Piper v. Chris-Craft Industries*, (1977) 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124. Neither case is, in our opinion, in point. *Piper* was an action at law by a disappointed tender offeror to recover damages for an alleged violation of § 14(e) of the Securities and Exchange Act of 1934. And, in denying a right of action in favor of the plaintiff, the court carefully cautioned, "[n]or is the target corporation's standing to sue in issue in this case." *Id.* at 42 n. 28, 47 n. 33, 97 S.Ct. at 949, n. 28, 952 n. 33. It cannot, therefore, be reasonably argued that *Piper* is authority against the right of Dan River to maintain this action.

In *Rondeau*, the sole claim raised by the target corporation in the district court was its right to injunctive relief because the defendant had been tardy in filing its Schedule 13D. 422 U.S. at 57, 95 S.Ct. at 2075. It was not until the case reached the Supreme Court that the corporation raised the question whether the statements in the Schedule were accurate and truthful and sought to litigate that issue. Because of the failure of the plaintiff to raise the point either in the district or circuit courts, the Supreme Court refused to consider the issue. *Id.* at 61 n. 11, 95 S.Ct. at 2077. But, the Supreme Court did emphasize in note 9, p. 59, 95 S.Ct. p. 2076, that the case before it "involve[d] only the availability of injunctive relief to remedy a § 13(d) violation following compliance" and cautioned that it was not a decision on "whether or under what circumstances a corporation could obtain a decree enjoining a shareholder who is currently in violation of § 13(d) from acquiring further shares, exercising voting rights, or launching a takeover bid, pending compliance with the reporting requirements." [5]

The district court, however, construed *Rondeau* as requiring the purchaser merely to file a Schedule 13D which *facially* met the requirements of the statute and as holding that, when there had been such facial compliance, the target corporation thereafter lacked any right to contest, and the Court any jurisdiction to consider, the accuracy or truthfulness of the essential matters stated in the Schedule 13D, irrespective of the basis for the corporation's objections. This conclusion is in direct contradiction of the decision reached in *GAF Corporation v. Milstein*, 453 F.2d at 721–22, which has long been regarded as the landmark authority on

---

5. These two comments, it seems to us, add up to a suggestion that the target corporation has a right to injunctive relief prior to compliance and, as we later indicate, compliance contemplates not simply the formal filing of a Schedule 13D but the filing of an accurate, truthful Schedule 13D, free of any misleading statements. And that certainly has been the construction of the Supreme Court's language by all the Circuit and District Courts which have been confronted with the question of the target corporation's right to maintain an action when there is a reasonable basis for assailing the accuracy or truthfulness of the essential state-

ments mandated by the statute for inclusion in the 13D Schedule. *E. g., GAF Corporation v. Milstein*, 453 F.2d 709, 721–22, (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *Wellman v. Dickinson*, 475 F.Supp. 783, 817 (S.D.N.Y.1979); *SEC v. GSC Enterprises, Inc.*, 469 F.Supp. 907, 913 (N.D.Ill. 1979); *W. A. Krueger Co. v. Kirkpatrick, Pettis, Smith, Polian, Inc.*, 466 F.Supp. 800, (D.Neb.1979); *Scott v. Multi-Amp Corp.*, 386 F.Supp. 44, 50 (D.N.J.1974); Brown, *Changes in Offeror Strategy in Response to New Laws and Regulations*, 28 Case W.Res.L.Rev. 843, 858 (1978).

the point. In that case, the court stated the issue:

"The more difficult question is whether GAF [the target corporation] has standing under section 13(d) to seek an injunction against allegedly false and misleading filings. The Milsteins in their brief argue that 'the short answer' is that false filing does not violate the section that requires the filing—i. e., section 13(d)—but rather the penal provision on false filings, section 32(a), or one of the anti-fraud provisions, for example, section 10(b)." *Id.* at 720.

It is manifest that the position of the defendants in that case was based on the very same circumstances which the district court in this case assigned as a reason for finding want of standing in favor of the plaintiff and lack of jurisdiction on the part of the court. The court, in *Milstein*, however, in resolving the issue, reached a contrary conclusion to the district court in this case. It said:

"With this teaching in mind, we conclude that the obligation to file *truthful* statements is implicit in the obligation to file with the issuer, and *a fortiori*, the issuer has standing under section 13(d) to seek relief in the event of a false filing." (Italics in opinion) *Id.* at 720.

And it proceeded at some length to justify its conclusion to sustain standing in the target corporation to raise, by appropriate allegations and proof, and jurisdiction in the district court to resolve, the issue of the accuracy and truthfulness of the filing.

This oft-cited case, it would appear, should be conclusive on the issue both of standing and of jurisdiction. The district court apparently dismissed it, though, because it preceded in time *Rondeau*. However, as we have already noticed, there is nothing in *Rondeau* which touched or weakened the decision in *Milstein*. And this has been the view of the courts which have been called upon to consider the standing and jurisdictional issues in the context of a claim of lack of a full and fair disclosure in the 13D Schedule, for, without exception, they have cited and relied on *Milstein* for

their own contrary conclusion. A recent example of such reliance is *Securities and Exchange Com'n. v. Savoy Industries*, (D.C. Cir.1978) 587 F.2d 1149 and 1165, *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979) where the Court said:

"Sections 13(d)(1) and 13(d)(3) and the rules promulgated thereunder undoubtedly create the duty to file truthfully and completely. To the extent that the violation of sections 13(d)(1) and 13(d)(3) inheres in the Schedule 13D that was filed, it was this duty that was breached. Because section 13(d) was designed, in part, to allow investors an opportunity to know of potential changes in corporate control and to evaluate the situation, and because disclosure that is not accurate subverts this purpose, it is plain that section 13(d) requires the making of a completely truthful statement. *GAF Corp. v. Milstein*, 453 F.2d at 720. 'The reporting provisions of the Exchange Act are clear and unequivocal, and *they are satisfied only by the filing of complete, accurate, and timely* reports' " (citing cases). (Italics added)

Again, in *General Aircraft Corp. v. Lampert*, (1st Cir. 1977) 556 F.2d 90, a case the district court professed to follow and which involved the adequacy of a 13D Schedule, the defendant challenged "[n]either the availability of a private suit under section 13(d) nor GAC's standing to bring such suit . . . ." *Id.* at 94, n. 5. In noting that conclusion, the court cited both *Rondeau* and *Milstein*. Undoubtedly it cited these cases at this point because, whether raised or not, jurisdictional standing is an issue to be considered *sua sponte* by the court, and, by its citation of these authorities, indicated it had done so, and the relief it later granted supports this conclusion. After discussing the record made in the target corporation's presentation, the court held on the target corporation's claim for relief "that the District Court did not err in finding, for purposes of preliminary relief, that appellants' Schedule 13D was inaccurate and misleading in stating that the purchase of shares was for the purpose of investment rather than acquisition of control." *Id.* at

95–6. In reaching that conclusion it began by approving as a definition of control within the contemplation of section 13(d) the definition set forth in § 12b–2(f), 17 C.F.R., Regulations of the Exchange Commission.[6] After finding the Schedule 13D in that case "a false one," the court next proceeded to consider the remedy available to the corporation. It ended by holding that, when there is a finding that a 13D Schedule is incomplete, inaccurate or false, the corporation has a right to injunctive relief "until the Schedule 13D is amended to reflect accurately their [the officers'] intentions." *Id.* at 97.

In *Chromalloy American Corp. v. Sun Chemical Corp.*, (8th Cir. 1979) 611 F.2d 240, the court similarly sustained the target corporation's standing to maintain, and the court's power to decide, an equitable action halting all purchases of Chromalloy stock by Sun and prohibiting Sun's use of already acquired stock to influence Chromalloy management until the completeness and truthfulness of a 13D Schedule could be adjudicated. The court found, after an evidentiary hearing, that Sun's statement of purpose in its 13D Schedule was inaccurate in that it "intended [through its acquisitions] to exert considerable influence" over the actions of Chromalloy's Directors, thereby securing what was for purposes of § 13(d) control of Chromalloy. *Id.* at 243. It proceeded, "[p]ursuant to 15 U.S.C. § 78m(d) [to enjoin] further acquisition of Chromalloy stock until Sun's Schedule 13D was amended to reflect this intention." Sun appealed this action and Chromalloy in turn appealed the failure of the district court to grant further disclosure. The circuit court sustained the district court in both rulings, thus sustaining the right of the target corporation to secure equitable relief requiring the purchaser to file an accurate, truthful, and complete Schedule 13D in order to make what the court specified as a "full and fair disclosure." *Id.* at 248 n. C16.

Under the reasoning of these cases, it follows that Dan River has a right to seek equitable relief enjoining the defendants, and should Dan River establish that there is a reasonable basis for concluding that the Schedule 13D filed by the defendants is inaccurate, incomplete, or misleading in its statement of any of the matters expressly demanded by section 13(d), the district court may and should grant appropriate injunctive relief and should require the filing of an amended Schedule 13D complying with the requirement of a truthful and complete statement as contemplated under the statute. The real question that the district court should have addressed, then, was whether the plaintiff's showing of the alleged inaccurate, untruthful, incomplete, or misleading character of the defendants' Schedule 13D was sufficient to resist a motion to dismiss or a motion for summary judgment. That was the crucial issue in the case and the issue the district court did not address. Generally, this issue presents "a question of fact that cannot be resolved on [a] motion to dismiss." *Securities Exchange Com'n. v. GSC Enterprises*, (N.D.Ill. 1979) 469 F.Supp. 907, 913.

The two matters in the amended 13D Schedule to which Dan River takes particular exception and on which it primarily relies for its claim that the amended Schedule was inaccurate and incomplete are, first, the failure of the defendants to have filed an earlier Schedule 13D when at the close of business on December 12, 1978 as contended by the plaintiff, but denied by the defendants, Unitex and the group affiliated with it first acquired more than five percent of Dan River's stock, and, second, the statement of purpose of acquisition included by the defendants in their amended Schedule 13D, a statement which Dan River contends was incomplete, inaccurate, and misleading.

■ We need not tarry over Dan River's first objection. Assuming that the defendants violated section 13(d) when they failed within ten days after December 12, 1978, to file a Schedule 13D, we believe that violation was rendered moot when the defend-

**6.** 17 C.F.R. § 240–12b–1.

ants later did file their Schedule 13D. As the district court correctly observed, section 13(d) is a disclosure statute intended for the benefit of stockholders. We have already noted that the sole basis of standing in favor of the corporation itself is to enforce the statutory mandate to file a Schedule 13D, which is complete, accurate, truthful, and not misleading. When the defendants in this case filed their original Schedule, even though tardy, the issue became not the earlier failure to disclose, but the truthfulness and accuracy of the Schedule as filed.[7] This is not to say that if any stockholder suffered damages as a result of the tardy filing, he would not be entitled to recover.[8] What we are concerned with here, though, is solely the right of the corporation itself, and, to repeat, that right is limited to equitable relief, compelling the filing of a full and accurate Schedule 13D.

Dan River's main attack is upon the accuracy and completeness of both the original Schedule 13D and the amended Schedule filed by the defendants. The particular statement on which Dan River centers its attack is the statement of purpose of acquisition, as required under the statute. This statement, Dan River charges, is a model of obfuscation, carefully phrased to confuse and conceal. It was this statement, the accuracy, completeness, and misleading character of which the district court found it lacked power to review. This failure to look beyond the face of the filing was, we think, error in light of the record then before the court.

The defendants at no point have declared clearly the purpose of their acquisition. There was unquestionably some purpose on their part quite different from making an "equity investment." The defendants in effect concede as much by their disclaimer of making the purchases as a "passive investor." Implicit in this disclaimer is the idea that there was some purpose beyond mere investment for investment sake. And this

conclusion seems compelling when it is noted that the defendant Unitex has pledged all its assets, and its major stockholders have pledged their personal credit, in order to finance, at interest rates two and a half percentage points above the standard prime rate, this "equity investment" in another company, located thousands of miles away from its headquarters in a foreign country, managed by officials unknown to the principals in Unitex, and paying dividends which would amount to only a fraction of what the defendants would be paying in interest in order to carry these purchases. This logic becomes even more persuasive when it is noted that, judging by the size of the loan secured to finance these purchases, the defendants are looking to the purchase of approximately twenty percent of the outstanding equity stock in Dan River. Such an accumulation of stock in a publicly held corporation frequently is regarded as control of a corporation. It is highly unlikely that Unitex would be seeking control of another corporation at considerable cost to it, if its interest were solely for investment.

If the defendants' purpose in making these purchases is obviously not for investment purposes, what is their purpose? Their statements in their second Schedule 13D seem calculated to convey the notion that their plans are indefinite and unformed. In this Schedule they say they may seek control of Dan River through their purchases, but presently they do not seek control. Of course, at this point in their purchase program when they have acquired but some eight percent of Dan River's stock, they could not hope to exercise control. But what is their intention if they successfully acquire the twenty percent of the Dan River stock they actually seek under their supposed plan of acquisition? Will they then seek control or at least seek to influence the decisions and actions of the target corporation? Is the language of the Schedule to be construed as

---

**7.** *See Missouri Portland Cement Co. v. H. K. Porter Co.*, (8th Cir. 1976) 535 F.2d 388, 396; *Corenco Corporation v. Schiavone & Sons, Inc.*, (2d Cir. 1973) 488 F.2d 207, 214–15.

**8.** *See*, Comment, *Private Rights of Action for Damages Under Section 13(d)*, 32 *Stan.L.Rev.* 581 (1980).

suggesting that they have no plan, whether exercisable at present or not, in connection with the purchases of Dan River stock when they have made their anticipated purchases? That they have no plan is inconceivable. There are significant items in the record which suggest that the purchases are part of a carefully formulated plan and that, in their extensive purchases, they intend to facilitate that plan. Thus, when the defendants sought financing for their purchases from Wardley, their lead banker, they were told that Wardley would consider the proposed financing, but only if it was convinced of the "financial soundness of Unitex's plan." Wardley agreed to finance the purchase. Presumably, then, Unitex disclosed to Wardley its purpose and plan in the proposed purchase. What was that "plan?" The defendants do not disclose it in this Schedule 13D. Moreover, when Unitex engaged the services of Lazard it is unlikely that it engaged the services of such an international financial firm with a recognized expertise in corporate mergers and acquisitions, simply to act as a broker merely to purchase stock. Was Lazard to assist in the plan disclosed by Unitex to Wardley? We can only conjecture.

The defendants did disclose in their first Schedule 13D what might have been an indication of their purpose. In this Schedule, they said that: "Mannip may seek to acquire a significant equity interest in the Company with a view toward establishing a long term relationship with the Company." This is close to a declaration of an intention to seek to control the target corporation for what the defendants would undoubtedly claim was for the mutual advantage of both parties.[9] But, in its second filing, the defendants omitted this significant admission of purpose. Are not the stockholders of the target corporation entitled to know what kind of "long term relationship" with Dan River the defendants sought to acquire by their purchases and would it not be relevant to know why this statement of purpose was omitted from the second schedule? Are not the two Schedules contradictory, or at least confusing?

We raise these questions, not because we find the answers to them in the record, but merely to suggest that the pleadings and the showing of the parties raise relevant questions that require further inquiry and that "cannot be resolved on [a] motion to dismiss." *Securities Exchange Com'n. v. GSC Enterprises*, 469 F.Supp. at 913. In reviewing the record of this case, we emphasize that we are not holding that the defendants' Schedule 13D is actually false, incomplete, or misleading. Moreover, that is not our function in this appeal. We simply conclude that Dan River has raised sufficient questions about the defendants' compliance with the law to require further exploration by the district court and the parties into the defendants' purpose in purchasing large amounts of Dan River stock.

9. Although the present requirements for Item 4 of a Schedule 13D do not use the word "control," but rather require disclosure of any "plans or proposals which result in or relate to extraordinary corporate transactions," SEC Exchange Act Release Nos. 33–5925, 34–14692, IC–10212, 43 Fed.Reg. 18484, 18493 (1978), the Eighth Circuit assumed, and we think correctly, that "any control purpose is still measurable against the definition of control appearing in Rule 12b–2(f)." *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d at 245–46, 246 n.12. Moreover, in defining "control" as applicable to a Schedule 13D filing, *Chromalloy, Id.* at 246–47, directs us to look to Rule 12b–2(f), which provides:

"The term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with') means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

17 C.F.R. § 240.12b–2(f) (1979). Under this definition we believe that section 13(d) requires disclosure of a control purpose whenever "the securities purchaser has a perceptible desire to influence substantially the issuer's operations," 611 F.2d at 246–47 (citing *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 696–97 (2d Cir. 1973)), regardless of proof of a "fixed plan" to acquire control. 611 F.2d at 247. That is, "Item 4 of Schedule 13D requires disclosure of a purpose to acquire control, [a word encompassing even 'the [indirect] power to . . . cause the direction of . . . policies,'] even though this intention has not taken shape as a fixed plan." *Id.*

Because, as one court has stated, "a false filing may be more detrimental to the informed operation of the securities markets than no filing at all," *GAF Corporation v. Milstein*, 453 F.2d at 720, a court simply cannot turn a blind eye to a potentially inaccurate filing when it possesses the injunctive power to have that filing corrected before irreparable harm occurs to the investing public.

It is no answer to plaintiff's cause of action that the defendants' filing is facially sufficient. When a plaintiff raises the number and kind of doubts about a Schedule 13D that Dan River raises here, a court is not to take a mechanical approach by refusing further inquiry into the plaintiff's allegations solely because the filing is facially adequate. *See S. E. C. v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963). Nor is it realistic for a court to rely, as apparently the district court in part did in this case, on the defendants' verifications of their amended 13D Schedule when one considers that the same Unitex officer also verified the initial Schedule, and that Dan River similarly verified its allegations. Rather, because Dan River offered sufficient information to show the very real possibility that the defendants' filings were not totally true or complete, it was justified in seeking the additional discovery necessary for the ultimate determination of whether the Schedule filed was accurate. *See Sun First Nat. Bank of Orlando v. Miller*, 77 F.R.D. 430, 438 (S.D.N.Y.1978).

The record suffices to make the truthfulness and completeness of the defendants' Schedule a justiciable issue into which the district court should have inquired. The uses of discovery and hearings are the usual judicial devices employed to resolve such justiciable disputes over the correctness of Schedules 13D. *See, e. g., Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240 at 247; *General Aircraft Corp. v. Lampert*, 556 F.2d at 96–97; *GAF Corporation v. Milstein*, 453 F.2d at 720–21; *Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1084–1086, (5th Cir. 1970); *Transcon Lines v. A. G. Becker, Inc.*,

470 F.Supp. 356, 378–79 (S.D.N.Y.1979); *Financial General Bankshares, Inc. v. Lance*, 80 F.R.D. 22, 23 (D.D.C.1978); *Securities and Exchange Com'n. v. Zimmerman*, 407 F.Supp. 623, 630–31, (D.D.C.1976), *aff'd in part, vacated and remanded in part sub nom. Securities and Exchange Com'n. v. Savoy Industries*, 587 F.2d 1149 (D.C.Cir. 1978), *cert. denied sub nom. Zimmerman v. Securities and Exchange Commission*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). The plaintiff has made a sufficient showing to support that right here. This does not mean that the plaintiff may use the discovery processes to harass the defendants or needlessly delay the resolution of this controversy. The district court is, however, perfectly competent to keep the discovery within the range of relevancy and to prevent the use of the court's processes for delay.

In reaching this conclusion we subscribe to the "[a]ccepted judicial philosophy [which] is to refrain from dismissing securities claims where it is possible that plaintiff can establish a jurisdictional basis for its claims upon completion of additional discovery." *Sun First Nat. Bank of Orlando v. Miller*, 77 F.R.D. at 435. This predisposition against summary dismissal of securities claims without discovery comports with a similar judicial sentiment held for all actions arising from complicated factual patterns. *E. g., Greenville Publishing Co., Inc. v. Daily Reflector, Inc.*, 496 F.2d 391, 398 (4th Cir. 1974) (antitrust); *Umdenstock v. American Mtge. & Inv. Co. of Oklahoma City*, 495 F.2d 589, 592 (10th Cir. 1974) (antitrust). A "sparing" use of summary procedures is particularly appropriate in litigation "where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (antitrust); *see Robinson v. Penn Central Company*, 58 F.R.D. 436, 440–41 (S.D.N.Y.1973) (securities laws).

The key issue in this case is the defendants' motive and intent in buying Dan River stock. Dan River wants to know this, and the investing public has a right to know it as well. Yet only the defendants can clarify the confusion they have created on this point; the proof is in their hands. If Dan River is not allowed to obtain from the defendants through discovery the facts vital to prosecuting this action, the defendants are effectively freed from the obligation of filing a complete and accurate Schedule 13D for only they can publish their motives and intent—as the law requires them to do. We believe that since the information crucial to this case is concentrated in the hands of the defendants, this is precisely the kind of litigation the Supreme Court said is inappropriate for the summary dismissal procedure it received. The defendants have shown no "adequate justification for denying plaintiff the opportunity to question [them] about the accuracy of the Schedule 13D" they filed, *Financial General Bankshares, Inc. v. Lance*, 80 F.R.D. 22, 22 (D.C. 1978); *cf. Robinson v. Penn Central Company*, 58 F.R.D. at 440 (appropriateness of discovering a defendant's knowledge prior to dismissal of a 10b–5 action).

Accordingly, we reverse the district court's dismissal of this action and remand the case to the district court for further proceedings not inconsistent with the foregoing. On remand the parties should be permitted to offer additional proof and to engage in any meaningful discovery, within the court's discretion. The issue on remand, however, should be restricted to the accuracy and completeness of the defendants' statement of purpose.

On the present record, no cause of action is stated against the appellees Wardley Limited and The Chartered Bank, and on remand the district court is directed to dismiss from this action the appellees Wardley Limited and The Chartered Bank.

*REMANDED WITH INSTRUCTIONS.*